273 P.2d 845

**MADSEN v. READ.**

No. 5766.

Supreme Court of New Mexico.

Aug. 30, 1954.

568

Carpenter, Eaton & Phelps, Roswell, for appellant.

Frazier, Cusack & Snead, Roswell, for appellee.

SADLER, Justice.

Shortly after the noon hour on March 18, 1953, at a point approximately one and one-half miles south of Roswell on Highway 285, little Judy Elaine Madsen, four and one-half years of age, was struck by defendant's pickup truck and killed in front of her home on the west side of the highway. Damages on account of her death were sought in an action instituted by her father as administrator of her estate which resulted in a verdict for the defendant on which judgment in his favor was entered

in the district court of Chaves County. The plaintiff in that action complains in this Court of the judgment and as the appellant here seeks its reversal. The parties will be designated here as they were below.

It was about 12:45 o'clock p. m. on March 18, 1953, when the victim of the tragic accident resulting in her death crossed the road in front of the family home, located on the west side of Highway 285 extending south from Roswell to the Whitcamp store and filling station, situated directly east and across the highway from her home. After purchasing the gum and candy which had occasioned her trip, the child started to cross the highway again to return home. Observing a pickup truck approaching from the south, she stood on the edge of the paving for a brief period and then started to cross the road to the rear of the pickup which had just gone by.

In the meantime the defendant, driving a pickup truck with a horse trailer attached at the rear, and accompanied by his three children, ranging from 14 to 9 years of age, was proceeding south at about 50 miles per hour and converging from a distance of 125 to 130 feet to the north on the route the child would take in crossing the highway. The mother of the child sensing danger to it had come from her house and had taken a position of watchfulness on the east side of the highway. She carried her young baby in her arms, and seeing the child about to start across the highway cried out, "Not yet, Judy!" But she was tragically too late. The child was already on the way. She was seen to disappear behind the pickup truck proceeding north, emerging from behind it on a dead run to the opposite side of the highway, only to be struck by defendant's pickup when within two (2) feet of safety. The broken body of the child was hurried to the hospital where she was pronounced dead on arrival.

The scene of the accident was only 1.8 miles south of the city limits of Roswell, the weather was clear and the view was unobstructed for half a mile in either direction from the scene of the accident. A somewhat vivid picture of how it happened may be visualized from the testimony of Sergeant Lawrence A. Halverson, an employee of Walker Air Force Base in Roswell. He was traveling on a motorcycle behind defendant's pickup as they passed beyond the city limits of Roswell. Testifying as a witness for defendant, he was asked questions and made answers, as follows:

"Q. State your name. A. Sgt. Lawrence A. Halverson.

"Q. You testified previously in this case yesterday? A. Yes sir.

"Q. Where do you live? A. Seventeen twenty-four and a half North Missouri, Roswell, New Mexico.

"Q. What is your occupation? A. I am employed at the Walker Air Force Base.

"Q. On March eighteenth, 1953 were you at or near the Whitcamp service station around noon on that date? A. Yes sir.

"Q. How were you travelling? A. South.

"Q. On what? A. On a motor vehicle.

"Q. Did you see a pickup with a horse trailer attached operated by Roger Read? A. That horse trailer and pickup were ahead of me.

"Q. Which way was that pickup travelling? A. South.

"Q. When had you first seen that pickup? A. Between McGaffey Street and the city limits.

"Q. Where was it the first time you saw it; was he ahead of you or behind you or where? A. He was passing me.

"Q. He passed you between McGaffey Street and the city limits? A. Somewhere along there.

"Q. After Mr. Read passed you was he in your vision continuously or up ahead of you continuously until the time you reached the Whitcamp service station? A. Yes sir.

"Q. How far ahead of you was he during that time? A. About three hundred feet.

"Q. Did he maintain a more or less even distance from the city limits to the Whitcamp filling station? A. Yes sir.

"Q. How fast were you going from the city limits to the Whitcamp filling station? A. Approximately fifty miles an hour.

"Q. As you approached the Whitcamp filling station did you see a pickup coming from the south going north? A. Yes sir.

"Q. Did you see a little child standing on the east side of the road out by the filling station? A. Yes sir.

"Q. At the time you saw the child where was the pickup coming north? A. It was pretty close to even with her, I cannot tell exactly.

"Q. Did you see the child start into the road? A. Yes sir.

"Q. Where was the pickup traveling north at time the child started crossing the road? A. Just after it passed.

"Q. Could you see the child after she got into the road? A. No sir.

"Q. Did you see her between the pickup coming north and the pickup going south as she crossed the road? A. No sir.

"Q. Did you see her after she started across the road until she got to the scene of the accident? A. No sir.

"Q. After the child started across the road what was the first thing you noticed at the scene of the accident? A. I noticed the trailer and the pick-up jack-knifed.

"Q. What did you see when you got down to the scene of the accident? A. I noticed the little girl on the side of the road and her mother was standing beside her, she had just come up there, and Mr. Read was coming from the pickup.

"Q. Where was the pickup at that time? A. In the bar pit.

"Q. He had cut over to his right off the road? A. Yes sir.

"Q. Did you see the tracks on the black top where the child had started across the road? A. Yes sir.

"Q. Did you see the skid marks which were put down by Mr. Read's vehicle prior to the time he reached the place where the girl's tracks were? A. I saw them but did not pay any attention to them.

"Q. You did not measure them? A. No sir.

"Q. Did you notice anything about their length? A. No sir.

"Q. Could you say with certainty whether or not there were seventy-nine yards of skid marks prior to that point?

"Mr. Carpenter: We object as the witness has shown himself not qualified to answer, he did not pay any attention to them and did not measure them.

"The Court: Sustained.

"Mr. Snead: We except.

"Q. Could you tell how far north of the point where the child came across Mr. Read's pickup was at the time she started across the road? A. No sir I could not tell you."

Another witness for defendant, Mrs. John Ernest, who had waited on the child while in the store and had accompanied her almost to the edge of the paving, gave a dramatic summary of what happened, as follows:

"Q. State in your own words what happened from the time the child stopped by the side of the highway until she was hit? A. Well, when she got to the highway and the big bus was coming from the North she waited for it, and there were two cars coming and she waited for them, there was a pickup coming from the South and she waited for it and when it passed she literally flew as she ran and her mother was calling, 'Not yet, Judy, not yet, Judy,' and she ran right in front of the pickup coming from the North."

Still another witness for defendant, E. J. James, who had been on the stand previously, testified:

"Q. You testified, I believe, that on March eighteenth, 1953, at the time of this accident you were approaching Whitcamp's service station from the South on highway 285 in your pickup? A. Yes sir.

"Q. As you approached the service station, I believe you testified you saw the child standing here right on the East side of the road when you were about a city block away? A. Yes sir.

"Q. Did you see the pickup with the horse trailer attached driven by Roger Read as you came up to the station? A. I did not notice him until after I passed the station.

"Q. He was coming from the North going South on that highway? A. Yes sir.

"Q. After you passed the little girl did you see her or do you know what she did after that time? A. No sir.

"Q. How far North of the place where the child was standing were you at the time you met Mr. Read's pickup? A. That would be hard for me to say, probably a hundred to a hundred and fifty feet; I was driving pretty slow at the time.

"Q. Did you go back to the scene of the accident a short time later? A. Yes sir.

"Q. After you passed the place where the child was standing and passed Mr. Read's vehicle, what was the first thing you noticed in the West? A. I just happened to look in my rear view mirror and noticed the cloud of dust and I could not see anything for the dust flying up and I thought at the time he probably ran off the road and nearly turned over.

"Q. What did you do after that? A. I turned around and drove back up.

"Q. Approximately how far North of the place where the child was standing were you at the time you made your turn and came back? A. Maybe a city block or a little farther.

"Q. What did you find when you got back to the scene there across from the Whitcamp's service station? A. The car and pickup were off the highway and the little girl was laying on the black top."

" * * * * * *

"Q. At the time you met Mr. Read's vehicle and he passed you coming South, was his vehicle skidding at that time? A. No sir."

And on cross-examination, he testified:

"Q. Was there anything there that you saw that could have obstructed the view of Mr. Read coming south in advance of the time he got to the child that would have prevented him

from seeing the child? A. No, sir, other than my pickup.

"Q. But that would be momentary, would it not, because you were going north and he was going south; that would be momentary would it not? A. Yes, sir."

The defendant testified on direct examination, as follows:

"Q. State just in your own words what happened from the time you left the City limits until you struck the child? A. I do not understand you.

"Q. Tell what happened from the time you left the City limits of Roswell on down until the time you struck this child? A. I was driving along about fifty miles an hour and when I came to that station out there I met Mr. James, and just as I met him I saw this little girl behind his pickup and she was probably about where the white stripe in the middle of the road is running as hard as she could run, and that the instant I saw her I slapped on my brakes and I thought I could turn to the right and miss her, and I saw Mrs. Madsen coming from the West, and my car had already hit the gravel and my trailer jack-knifed and then I hit her and went to the ditch, and that was all of it, and I went back and the little girl was laying on the side of the pavement.

"Q. Who was in the pickup with you? A. A little girl fourteen years old and two little boys eight and nine years old.

"Q. Were they in the seat with you? A. Yes, sir.

"Q. At the time you first saw the child where was Mr. James' pickup? A. I had just met him and I guess he was probably 20 feet *passed* the child, I would say; I did not see the child until after I had passed him, after I had met him.

"Q. Did you do everything you could to miss hitting the child? A. I certainly did.

"Mr. Carpenter: We object to that question and answer.

"The Court: Sustained.

"Mr. Snead: We except.

"Q. What did you do after you saw the child? A. As soon as I saw her I slapped on my brakes, I thought maybe she could see me but I do not think she saw me as the tracks were in the dust that came off her shoes on the pavement and I do not think she ever slowed down and do not think she ever knew what hit her as she never saw me at all.

"Q. At the time you first saw the child how far were you from her? A. Well, I would say 40 or 50 feet; that is according to my skid marks, but I

guess I was farther than that as I had to put my brakes on, but I think I skidded forty or fifty feet before I hit her."

On cross-examination, among other testimony, the defendant stated:

"Q. How far were you North when you first saw this child? A. I skidded about 40 or 50 feet, my skid marks, and at the instant I saw her run from behind the pickup that is when I hit my brakes.

"Q. That is not in answer to my question; how far in your judgment were you North of the child when you first saw her? A. Forty or fifty feet.

"*    *    *    *    *    *

"Q. If you had had your pickup under control you could have turned to the left? A. I had it under control when I saw her. I did not have time to turn to the left, I thought maybe she would see me and stop, and then I turned to the right and saw this woman and then hit the little girl.

"Q. There was nobody immediately in front of you driving? A. I did not see anything.

"Q. You never saw the mother of the child standing there? A. Not until after I saw the little girl.

"*    *    *    *    *    *

"Q. What, if anything, kept you from seeing the mother standing at the edge of the pavement or what kept you from seeing the child moving at the edge of the pavement? A. She was on my left on the other side of the road, and the way I thought after it happened maybe I could not see her on account of this pickup. Here is the pickup and here is she, and that would be just a second but I did not see her."

It should be added that the highway proceeds in a straight line for half a mile in either direction from where the accident occurred; also that the paved portion of the highway is 25 feet in width with a white center line and shoulders on either side 12 feet wide sloping gently into the bar ·pits. The foregoing presents a fair and concise summary of the facts at close of the case. Upon them and inferences deducible from them the jury's verdict must rest for support. The defendant asked for a directed verdict in his favor which the court denied. It also denied plaintiff's request for the submission of three special interrogatories, as well as certain specially requested instructions, and the cause was submitted on instructions calling for a general verdict one way or the other. The jury returned into court a verdict finding the issues in favor of the defendant. In due course the court entered judgment in his favor from which the present appeal is prosecuted.

The plaintiff's counsel present their claims of error on appeal under four points. The first is that the court erred in instructing on the sudden emergency theory

because the evidence discloses the defendent was negligent as a matter of law. To state his position differently, it is argued on behalf of plaintiff that a defendant may not claim an instruction based on sudden emergency when the emergency relied upon is one deriving from his own negligence. 61 C.J.S. Motor Vehicles, § 535, p. 607; Nikoleropoulos v. Ramsey, 61 Utah 465, 214 P. 304; Prauss v. Adamski, 195 Or. 1, 244 P. 2d 598. We may concede the correctness of this claim but it only carries us right back to the decisive inquiry—was the plaintiff negligent? The jury's verdict furnishes a negative answer to the inquiry and if there be substantial evidence supporting its verdict, this claim of error must be resolved against the plaintiff.

We are compelled to view the evidence in the light most favorable to the defendant (appellee) in whose favor the verdict was returned. Mesich v. Board of County Commissioners, 46 N.M. 412, 129 P. 2d 974, and Seal v. Safeway Stores, Inc., 48 N.M. 200, 147 P.2d 359. The weight of argument presented by counsel for the plaintiff is that with an unobstructed view of half a mile in either direction from the scene of the accident, and with the child standing on one side of the highway awaiting a crossing to opposite side near which her mother stood to receive her, the defendant may not excuse himself from seeing what was plainly obvious. In other words he must have seen, indeed, could not have avoided seeing, whatever was in his line of vision, had he been using ordinary care in driving his pickup truck immediately prior to striking the child. The fact that the Sergeant Halverson, riding a motorcycle and following defendant's car some 300 feet behind it, observed presence of the child on the road when an estimated 500 feet from where she stood, is treated by counsel as practically conclusive evidence that the defendant actually saw, or should have seen, the child in time to slacken his speed and to assume a degree of watchfulness essential to her safety.

We have carefully reviewed the evidence in the case and although admittedly the question is a close one, we are constrained to hold the trial court did not err in permitting the jury to pass upon the defendant's negligence, vel non. While not unmindful of the force of the argument of plaintiff's counsel, the mere fact that the driver of a motor vehicle fails to see a pedestrian in his line of traffic in time to avoid striking him, is not always and necessarily to be taken as proof he was guilty of negligence as a matter of law. In some cases, yes—in others, no. This seems to us a case where we must supply a negative answer to the inquiry.

There are cases, of course, where no other conclusion will lie. It then becomes the duty of the court so to rule by taking the issue of negligence from the jury, or so de-

claring as a matter of law in non-jury cases. Ortega v. Koury, 55 N.M. 142, 227 P.2d 941. On the other hand, there may be circumstances under which, had the defendant been more observant, the presence of a pedestrian in a position of danger could have been seen, nevertheless, the movement of traffic or other circumstances may have interfered with that keenness of observation which would have disclosed the danger. It then becomes a question for the jury to say whether there was in fact negligence or contributory negligence. See Mayfield v. Crowdus, 38 N.M. 471, 35 P.2d 291. As said by this Court in Olguin v. Thygesen, 47 N. M. 377, 143 P.2d 585, 592:

"The circumstances of each case must determine the degree of alertness required of a driver in keeping a lookout for road hazards; and, usually, as here, it becomes a question for the jury."

There are here present facts which in our view distinguish this case from that of Ortega v. Koury, supra, so much relied upon by the plaintiff. There damages were sought for the death of a 3½ year old child being struck and killed on a certain street in the city of Sante Fe. The claim was that defendant must have seen the child, since he had an unobstructed view for 600 feet ahead of him. This Court held the facts convicted defendant of negligence as a matter of law. But there is this significant language in the recitation of facts [55 N.M. 142, 227 P.2d 942]:

"* * * There were no other cars or other obstructions upon the street interfering with the defendant's view or his operation of the car. The defendant had a clear view for approximately 600 feet ahead of him."

In the case at bar there was a northbound car passing the child standing beside the highway, at the very time, as the jury could have concluded, when the sweep of defendant's vision over the area ahead might otherwise have disclosed her presence. Close as the question may seem, we are satisfied the trial judge did not abuse his discretion in permitting the question of defendant's negligence to go to the jury. Mayfield v. Crowdus, supra; Frei v. Brownlee, 56 N.M. 677, 248 P.2d 671.

The plaintiff's second claim of error relates to the trial court's refusal to give his requested instruction No. 11, reading:

" 'Control', or 'proper control' as used in these instructions means that the driver shall have ability to stop readily and easily."

and the giving of the court's instruction No. 3, which reads:

" 'Control' or 'proper control' as used in these instructions, means that the driver shall at all times operate

his vehicle in a careful and prudent manner under the circumstances and exercise such control as a reasonable and prudent motor vehicle operator would exercise under the same or similar circumstances."

This point presented by counsel for plaintiff, reads:

"Where the defendant is negligent as a matter of law in failing to see a four year old child immediately adjacent to a highway, the instruction on proper control should be more specific than that the driver shall operate in a careful and prudent manner under the circumstances and exercise such control as a reasonable and prudent operator would exercise under similar circumstances, and a request defining proper control as ability to stop readily and easily should be given."

It would be enough to mention as a complete answer to this point that it is predicated by counsel on an assumption which is non-existent in the facts. He rests the proposition urged on an assumption that defendant has been, or should be, held to be negligent as a matter of law. The jury found otherwise and the record discloses substantial evidence to support that finding. But laying aside this consideration, we think the point lacks merit. A comparison of the instruction given (No.15) with that refused defining "control" or "proper con-

trol," when read in the light of other instructions submitted without ·objection touching "due or ordinary care" (No. 6) leaves no doubt in our minds that the jury were adequately charged on the subject and could not have been misled. 1 Blashfield (Pt. 1) Cyclopedia of Automobile Law and Practice 677, § 748; Carruthers v. Campbell, 195 Iowa 390, 192 N.W. 138, 28 A.L.R. 949, and annotation at 28 A.L.R. 952.

The plaintiff's third claim of error is that the trial court erred in refusing to submit to the jury three special interrogatories requested by him. They read as follows:

"1. Do you find that the defendant saw or could have seen, with the exercise of ordinary care, the deceased child, Judy Elaine Madsen, standing near the paved portion of the highway in time to have put his motor vehicle under proper control so as to have avoided the accident?

"2. If your answer to interrogatory No. 1 is no, then do you find that the defendant upon seeing the said child upon and crossing the highway could have avoided striking the child by the exercise of ordinary care?

"3. Do you find that the defendant at the time he saw or could have seen the deceased child, Judy Elaine Madsen,

was operating his vehicle in excess of 50 miles per hour?"

It is claimed that the refusal represents an abuse of discretion on the part of the trial judge in applying Rule 49 of the District Courts, 1941 Comp. § 19–101(49), reading as follows:

"Rule 49. General verdict accompanied by answer to interrogatories.— In civil cases, the court shall, at the request of either party, in addition to the general verdict, direct the jury to find upon particular questions of fact, to be stated in writing by the party requesting the same. When the special finding of facts is inconsistent with the general verdict, the former shall control the latter, and the court shall give judgment accordingly."

Notwithstanding the use of the word "shall," mandatory in form, counsel agree the trial court exercises a broad discretion in applying the rule. Larsen v. Bliss, 43 N.M. 265, 91 P.2d 811; Crocker v. Johnston, 43 N.M. 469, 95 P.2d 214. There were no involved or complicated questions in the trial of this case. The only questions to be submitted to the jury as the case finally shaped up before the jury were whether the defendant was negligent and, if so, whether that negligence proximately caused the death of the child. Even the latter inquiry might very well be eliminated from consideration for there was no doubt about proximate causation. The evidence being so considered, we see no abuse of discretion in the trial court's action in refusing the plaintiff's request in this behalf. To grant it could only tend to confuse. See cases cited above.

Finally, counsel for plaintiff urge upon us the claim that the trial court erred in failing to grant his motion for new trial. Largely, it is a reassertion of previous questions already argued, but in the respects in which additional grounds of error are sought to be injected, we find them either to be without merit, or unavailable to plaintiff by reason of failure to reserve the claimed errors below. It follows from what has been said that the judgment under review should be affirmed.

It is so ordered.

McGHEE, C. J., and COMPTON, LUJAN and SEYMOUR, JJ., concur.